## JEWETT v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. March 29, 1900.)

No. 291.

1. MOTION—ORDER—DISCREPANCY BETWEEN RECORD AND DOCKET ENTRY.

Discrepancies between an order of the district court remitting a case to the circuit court, and the docket entry pertaining to the same matter, are immaterial, since the docket entry cannot be read in· contradiction of the order after the record has been properly extended.

2. CIRCUIT COURT—JURISDICTION—CRIMINAL CASE REMITTED FROM DISTRICT COURT—RECORD OF INDICTMENT.

The jurisdiction of the circuit court of a criminal cause remitted to it by the district court is not affected by the fact that no record of the indictment was retained in the district court.

3. SAME—SENDING ORIGINAL COPY OF INDICTMENT WITH RECORD.

Under Rev. St. § 1037, providing that the remission of a criminal cause from the district to the circuit court shall carry with it all recognizances, processes, and proceedings pending in the case in the court from which the remission is made, it is not error for the district court in such case to send up the original copy of the indictment, as a part of the record.

4. CRIMINAL LAW—CONVICTION—SENTENCE—APPEAL.

The rule applied that, where the sentence imposed by the circuit court upon the trial of a criminal cause is less than the maximum that might be inflicted under either of several counts of the indictment under which defendant was convicted, the conviction will stand on appeal if any count is found sufficient.

**5.** SAME—CONVERSION BY NATIONAL BANK OFFICER—INDICTMENT—CERTAINTY OF ALLEGATIONS.

Under Rev. St. § 5209, providing for the punishment of an officer or agent of a national banking association who willfully misapplies its assets, an indictment charging that the accused did unlawfully. fraudulently, and willfully misapply and convert to his own use the assets of a national bank, with the intent then and thereby to injure and defraud the association, which conversion was done by some means and in some manner to the grand jury unknown, is not bad for want of certainty, in that it does not otherwise allege how the funds were misapplied by defendant.

**6.** SAME—MISAPPLICATION OF ASSETS OF NATIONAL BANK—CONSTRUCTION OF STATUTE.

The misapplication of the assets of a national bank, in process of liquidation, by an agent appointed to close its affairs, is an offense within the provisions of Rev. St. § 5209, making it a crime for any officer or agent of such association to willfully misapply its assets.

**7.** SAME—INDICTMENT—DUPLICITY.

An indictment charging one, as "president, director, and agent" of a national bank in process of .liquidation, with willfully misapplying the assets of the bank, is not bad because of inconsistency, nor for duplicity.

**8.** SAME—AGENCY OF PRESIDENT.

The president of a national bank, who has been appointed by the shareholders to close its affairs in liquidation, with authority to collect its credits, is an "agent," within the provisions of Rev. St. § 5209, providing for the punishment of any agent of a national banking association who willfully misapplies its assets.

**9.** SAME—INDICTMENT.

The rule applied that an indictment charging one, as agent of a national banking association, with willfully misapplying the assets of the association, need not allege that the association is carrying on a banking business.

**10.** SAME—INDICTMENT OF PRESIDENT AS AGENT.

The fact that the officers of a national banking association which has gone into liquidation occupy the relation of trustees for creditors does not preclude the president of the association, who has been appointed as agent by the shareholders, to assist in the liquidation, from being prosecuted under Rev. St. § 5209, for willfully misapplying the assets of the association.

**11.** SAME—JURY—PEREMPTORY CHALLENGES.

The offense of misapplying the assets of a national banking association by an officer or agent being a misdemeanor, under Rev. St. § 5209, the defendant in a prosecution for such defense is entitled to only three peremptory challenges to the jury.

**12.** SAME—INDICTMENT—CONVICTION FOR INCLUDED OFFENSE.

Under an indictment charging one, as president and agent of a national banking association, with "willfully misapplying" the assets of the association, contrary to Rev. St. § 5209, the accused may be convicted of misapplying assets in his actual possession, since the word "misapplication" is the broader term, and includes the offense of embezzlement.

**13.** SAME—EVIDENCE—VERDICT—APPEAL.

An indictment for willfully misapplying the assets of a national banking association charged defendant with having in his possession, on a day named, several classes of assets of the association, valued at $10,000, $3,000, or $1,000, all of which were on said date misapplied by defendant. On the trial the government relied for conviction upon an item appearing in defendant's statement of alleged payments made by him as agent in liquidation for said association, and showing a payment of $4,000, on account of shares of stock, to one B., on a date two months later than that laid in the indictment. Under the instructions of the court, however, the issue formed for the jury was whether or not the sum stated in the account was in fact paid to B., or was appropriated by defendant under cover of such entry. No complaint was made of this instruction, and there was evidence tending to support a verdict against defendant upon

100 F.—53

the issue thus presented. *Held* that, on the record, the question whether the verdict was sustained by the evidence was, under the circumstances, for the trial court, and its determination could not be reversed on appeal.

In Error to the Circuit Court of the United States for the District of Massachusetts.

For former opinion, see 84 Fed. 142.

William S. B. Hopkins and Hollis R. Bailey, for plaintiff in error.

Boyd B. Jones, U. S. Atty. (John H. Casey, Asst. Dist. Atty., on the brief).

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

·PUTNAM, Circuit Judge. Jewett, the plaintiff in error, was the president of the Lake National Bank of Wolfeborough, and, without formally resigning that office, he was constituted the agent of the association to close its affairs in liquidation, as provided by section 5220 of the Revised Statutes. The offenses with which he is charged occurred while he was acting as such agent. At a term of the district court for the district of Massachusetts, Jewett was indicted for violation of section 5209 of the Revised Statutes. The indictment was remitted to the circuit court, accompanied with the following order:

"May 14, 1897.

"District Court of the United States, District of Massachusetts—ss.

"And now, it appearing to the court that the district attorney deems it necessary, it is ordered that this indictment be remitted to the next term and session of the circuit court of the United States for this district.

"Attest:                                    Frank H. Mason, Clerk."

The indictment included 96 counts. The bill of exceptions says that 13 offenses were charged in the first 78 counts. We are not informed how many offenses were charged in the remaining 18 counts. During the trial the United States, with the consent of the accused, nol pros'd all but 7 counts. At what stage of the trial this took place, the record does not show. The jury found a verdict of guilty on counts 84 and 95, and disagreed as to the other counts submitted to them. Count 84, the only one with which we will deal, laid a date of the 1st day of September, 1893, and charged that on that date Jewett had constant and free access to all the assets of the association, consisting of certain credits, certain money, divers promissory notes, divers certificates of deposit, divers gold coins, and divers silver coins, of all of which a more particular description was alleged to be to the jurors unknown. It, however, alleged for each class of assets values of $10,000, $3,000, or $1,000. The count charged that on the day named Jewett misapplied all of the assets described. In support of this count the United States at the trial relied on alleged dealings of Jewett on or about November 1, 1894, to the amount of $4,000, which Jewett claimed to have paid to one A. E. Butler. In what way it could be maintained that the grand jury in this count, laying a transaction under date of September 1, 1893, with no other particular description whatever, unless the sums

to which we have referred, of $10,000, $3,000, and $1,000, and without any mention of A. E. Butler, could be supposed to have had reference to a transaction of November 1, 1894, to the amount of $4,000, claimed to have been paid to Butler, it is difficult to understand. We will show, however, at the proper place, that this does not raise any question over which we have jurisdiction.

The first matter brought to our consideration is the alleged invalidity of the remission of the indictment to the circuit court. This was made under section 1037 of the Revised Statutes. The order of the district court which we have recited conforms to that section. The plaintiff in error calls our attention to some discrepancies between this order and the docket entry in the district court appertaining to the same matter; but it is settled law that, while a docket entry may temporarily be accepted as the record, yet it is of no consequence, and cannot be read, after the record is properly extended. The plaintiff in error also says that no record of this indictment was made in the district court, but we are not concerned with this, because errors of this nature could not affect the jurisdiction of the circuit court.

The only serious question raised in this connection grows out of the fact that the original indictment was sent to the circuit court. It is claimed that it should have been retained in the district court, and only a transcript sent up. The practice in the several states in this particular is so variant that nothing can be deduced from it which will enable us to declare that bringing up either the original indictment or the tenor of it would be irregular. The cases are cited in a note to 1 Bish. New Cr. Proc. § 73. This varying practice may well be thought to grow out of the rule by which, on writs of error, the tenor of the record is often regarded as the record proper, and out of the further fact that whether the record itself should be removed, or only a transcript sent up, was at times, at the common law, a mere question of convenience or safety. Yet, wherever the court into which the record was to be removed on error had jurisdiction to proceed to execution, the original record was usually brought up. 3 Bac. Abr. "Error," D, 2; Tidd, Prac. (1st Am. Ed.) 1135, 1136. Indeed, so strictly was this observed, that in the house of lords, which did not proceed to execution, though it could, the chief justice attended with both the original record and a transcript of it, afterwards returning the original to the king's bench. As the exchequer chamber could not proceed to execution, there was never a semblance of remitting to it more than a transcript of the record. Tidd, Prac. (1st Am. Ed.) 1135. The same methods of procedure existed at common law on certiorari to remove an indictment for trial to the king's bench from an inferior court. 2 Bac. Abr. "Certiorari," H. Usually the original indictment was returned, unless the court which issued the certiorari had no jurisdiction to proceed on the record. It is an expressive fact that it is stated as exceptional that the return of the tenor of an indictment from London was sufficient. The forms of writs of certiorari, and of the returns thereto, in Lilly's Modern Entries, correspond to the practice thus stated.

The provisions of law under which this indictment was removed are stated somewhat more fully in the original act of August 8, 1846 (9 Stat. 72), than in the corresponding sections 1037 to 1039 of the Revised Statutes; yet there is no essential difference, and the substance of the original statute is found in its revision. It is to be noticed as a fact of some consequence that in all the provisions of statute with reference to the removals of suits from the state courts to the circuit courts, including criminal prosecutions, and in the like provisions for writs of error and appeals, there is found, either expressly or by implication, a direction for sending up the transcript of the record. In view, nevertheless, of the practice to which we have referred, by virtue of which the tenor of the record is often regarded as the record itself, and of the facilities which the law gives for bringing forward original papers from time to time as needed, we are not required to pass on the question whether or not the sending up of a transcript of the indictment in lieu of the original would be an irregularity which would defeat jurisdiction. Indeed, at the common law, whether the record itself came up, or only a transcript, was, as we have already said, at times a mere question of safety or convenience, as shown on error to the common pleas or to the king's bench in Ireland. 3 Bac. Abr. "Error," D, 2; Vicars v. Haydon, Cowp. 841.

The plaintiff in error suggests that some minor difficulties might arise from the particular proceedings on removal in the case at bar; but, clearly, by the provisions of section 1037 of the Revised Statutes, nothing was required in the circuit court primarily, except the indictment itself and the order of remission. No difficulties are shown to have arisen in the case at bar; but, if any had been shown, they could easily have been met by a suggestion to the circuit court, with a proper writ of certiorari to the court below, or, in the case of removal from the circuit court to the district court, with a like suggestion, and the appropriate proceedings which might follow it. Therefore, looking at the letter of the statute on which the remission was based, and at the practices of the common law to which we have referred, and regarding, also, the interest which a person accused has in a right to inspect at any stage of the proceedings the original indictment, we are satisfied that the custom of sending forward the original, which has prevailed in this circuit from the origin of section 1037, cannot be disturbed. Of course, so far as the statute refers to "proceedings" and the "order of remission," it must be accepted that all purposes are accomplished, and that, therefore, the statute is satisfied by compliance with the common practice to which we have already referred, which permits a transcript in lieu of the original when a mere question of convenience is involved.

The counts on which Jewett was convicted were demurred to, and the overruling of the demurrer affords the basis of the second group of objections to the proceedings. As the sentence imposed by the court was less than the maximum which might be inflicted under either count, it is a well-settled rule of the federal courts that the conviction must stand if either is found sufficient. Evans v. U. S.,

153 U. S. 584, 595, 14 Sup. Ct. 934, 939, 38 L. Ed. 830, 839. The objection to count 84 is want of certainty, in that there is no distinct allegation of any unlawful act, because the grand jury reports that it was ignorant how Jewett misapplied the funds described. It is well settled, not only as a general rule of the common law, but in the supreme court, that the grand jury is entitled to set out in its indictment that certain facts, ordinarily necessary to be alleged, are to it unknown. This rule was applied to the description of persons whom there was an intent to defraud, under the section on which this indictment was framed, in U. S. v. Britton, 107 U. S. 655, 665, 2 Sup. Ct. 512, 27 L. Ed. 520. The same result was reached in Coffin v. U. S., 156 U. S. 432, 451, 15 Sup. Ct. 394, 39 L. Ed. 481, with the additional statement that, where nothing appears to the contrary, the verity of the averment of want of knowledge in the grand jury is presumed. In Frisbie v. U. S., 157 U. S. 160, 167, 15 Sup. Ct. 586, 39 L. Ed. 657, the rule was applied to the description of the excess amount received by an agent engaged in prosecuting a claim for a pension over that permitted by statute. In Durland v. U. S., 161 U. S. 306, 314, 16 Sup. Ct. 508, 40 L. Ed. 709, it was applied with reference to the names of persons defrauded, or intended to be defrauded, contrary to section 5480 of the Revised Statutes. There is, therefore, ground for maintaining, if necessary to do so, that the well-known practice of the common law and the decisions of the supreme court go far enough to cover the particular allegation objected to by the accused; but it is not necessary to determine this proposition. Count 84 is based on that provision of section 5209 of the Revised Statutes which reaches an officer or agent of an association who willfully misapplies assets. Batchelor v. U. S., 156 U. S. 426, 429, 15 Sup. Ct. 446, 39 L. Ed. 478, repeats emphatically the rule that these words have no settled technical meaning, like "embezzle," also found in the same section, so that they must be supplemented by further averments showing wherein the misapplication was unlawful. But the count in question alleges that the accused did unlawfully, fraudulently, and willfully misapply and convert to his own use the assets of the bank, with intent then and thereby to injure and defraud the association. Then follows the allegation that this conversion was done by some means and in some manner to the jurors unknown. But, having alleged that the accused had unlawfully, fraudulently, and willfully misapplied and converted to his own use the assets of the bank, with intent to injure and defraud the association, no further allegation as to the means or manner was required. What was alleged would clearly have amounted to a charge of embezzlement at common law if the assets had been in Jewett's personal possession, and the allegation that Jewett did convert to his own use shows how the misapplication was made, and that it was an unlawful one, within the requirements of Batchelor v. U. S. Certainly it cannot be held that an allegation of all the elements which would constitute embezzlement, in the technical sense of the word, if charged against a person who had possession, is not a sufficient allegation of an unlawful misapplication, and of the means of mis-

application. We may therefore reject as surplusage the additional allegation to which the accused objects.

The next point made by Jewett is that section 5209 of the Revised Statutes has no application to a bank in liquidation, or to an agent appointed to close its affairs. Clearly, both are within the letter of the statute, and within the mischief it was intended to remedy. Indeed, there would seem to be more ground for holding the terrors of the law over an agent who is in uncontrolled possession of the assets of an association, than over an officer who is at all times subject to the scrutiny of those who are about him or over him. That an association in process of liquidation is still an existing corporation was determined in Central Nat. Bank of Baltimore v. Connecticut Mut. Life Ins. Co., 104 U. S. 54, 72, 73, 26 L. Ed. 693. That case was strikingly close to the present one, because there, as here, the directors had authorized the president and acting cashier to do whatever was necessary in the liquidation of the business of the association. The essential principle of Central Nat. Bank of Baltimore v. Connecticut Mut. Life Ins. Co. was applied in Chemical Nat. Bank v. Hartford Deposit Co., 161 U. S. 1, 16 Sup. Ct. 439, 40 L. Ed. 595, in which latter case the association had passed into the hands of a receiver appointed by the comptroller of the currency under the provisions of the Revised Statutes. Central Nat. Bank of Baltimore v. Connecticut Mut. Life Ins. Co. was cited at page 8, 161 U. S., page 442, 16 Sup. Ct., and page 598, 40 L. Ed., as an authority for the conclusion reached in the later case,—that even the insolvency of a national banking association, and the consequent appointment of a receiver, did not terminate its existence as a corporation.

It must be observed that no such office as an agent in liquidation is known to the statute, and also that the count declared against Jewett alike as president, director, and agent. It is well settled that this form of allegation does not involve either inconsistency or duplicity. The case cited by the plaintiff in error referred to a plaintiff in a civil suit, and the court properly required him to elect in what capacity he would proceed; but as the same person may be both president, director, and agent of a banking association, the form of allegation in respect thereto found in this count is common in this class of indictments, and has been explicitly recognized by the supreme court as valid. U. S. v. Northway, 120 U. S. 327, 7 Sup. Ct. 580, 30 L. Ed. 664. The extent to which this form of pleading is permitted, even in capital cases, is pointed out in an interesting way in Andersen v. U. S., 170 U. S. 481, 18 Sup. Ct. 689, 42 L. Ed. 1116.

Although the agency which Jewett exercised was not in terms created by the statute, yet it has been so long recognized as permitted by the law, going back at least as far as Central Nat. Bank of Baltimore v. Connecticut Mut. Life Ins. Co., already cited, decided in 1881, that it cannot now be questioned; and in fact it is not questioned in the case at bar. We must assume, therefore, that there is no doubt in reference to the fact of agency, nor can there be any as to its nature. The plaintiff in error is described in count

84 "as an agent to assist said association in such liquidation." It then alleges that Jewett, as such agent, had authority from the association to collect all its credits. These allegations show that the authority given Jewett with reference to certain very important matters connected with closing the affairs of the association, if not to all of them, was as extensive as that which would have vested in its president and directors if no agent had been appointed.

Therefore, as we have already said, the spirit of the statute reaches the case. Consequently we are not justified by any rule of construction in so far clipping the letter of the statute, which expressly uses the word "agent," as to exclude this case from its purview. Of course, the rule noscitur a sociis applies here as everywhere; and when the statute groups representatives of the corporation in the following language, "president, director, cashier, teller, clerk, or agent," we are not permitted to hold that one occupying the position of the plaintiff in error is excluded from the classes of persons within its purview, however it might be with some one exercising temporary or special authority, who would not, in the mind of the legislature, be commonly associated with the recognized officers of the bank.

The plaintiff in error refers us to an expression found in U. S. v. Britton, 107 U. S. 655, 662, 2 Sup. Ct. 512, 27 L. Ed. 520, already cited, to the effect that certain counts under section 5209 of the Revised Statutes, there under consideration, require an averment that the association is carrying on a banking business. First of all, this was not necessary for the decision of that case, which also related only to alleged false entries; but, more especially, the effect which the plaintiff in error gives to the opinion is so broad as to defeat itself, because the opinion refers, not to an agent in liquidation, but to a "president or other officer" of a national banking association. If applied broadly to embezzlements and misapplications, the result would be that the president and directors of an insolvent institution might, so far as the criminal law is concerned, carry off its assets with impunity the day after it closed its doors. The probability is that the court had in mind only the necessity of its appearing that the association was something more than a mere paper organization; in other words, that it was what is represented in the count in issue here by the words "duly organized and existing," and "having its usual place of business."

The plaintiff in error also refers to certain expressions in Richmond v. Irons, 121 U. S. 27, 60, 7 Sup. Ct. 788, 30 L. Ed. 864, to the effect that the officers of a national banking association which has gone into liquidation occupy the relation of trustees for the creditors. This may be true, to a certain extent, even though the corporation be supposed to be solvent, if it be also in liquidation. McDonald v. Williams, 174 U. S. 397, 403, 19 Sup. Ct. 743, 43 L. Ed. 1022. This applies, however, as well to the directors of an association as to its agent in liquidation. In neither the one case nor the other do the directors cease to be directors, or the agent to be agent. Richmond v. Irons, if applied as the plaintiff in error maintains, would again be too broad, because, on his proposition,

not only would he, as agent in liquidation, go free from the statute, but the president and directors of the association, if no agent had been appointed, would also go free from it.

This count does not show the fact in the better way, but we assume that Jewett was appointed agent by a vote of the shareholders; and he claimed at the trial, therefore, that he was merely the representative of the shareholders, and not of the association. The vote of the shareholders, however, must have been taken in their corporate capacity; and so the fine distinction which the plaintiff in error seeks to make on this point has no foundation of law. Whether or not the statutory agent who may be appointed by the shareholders of an association under section 3 of the act of June 30, 1876 (19 Stat. 63), is subject to the penalties of section 5209 of the Revised Statutes, we need not consider. He is not the same "agent" as the plaintiff in error. The position was created after section 5209 was enacted, and so it is impossible to reason by analogy from one to the other. The suggestion that some parts of section 5209 evidently relate to a going institution in no way assists Jewett, because the section groups together many offenses of an entirely different character. As justly said by the plaintiff in error, there is nothing in the history of the statute which throws any particular light on the question raised by him. Neither do the special rules of construction of penal statutes invoked by him assist him, because the language of the section is explicit on the point under consideration. It needs no construction, except so far as it may exclude those who are impliedly excluded by the way in which the word "agent" is grouped, as we have already pointed out.

The plaintiff in error was allowed three peremptory challenges, but he claimed ten. Since the statute expressly declares his offense a misdemeanor, this proposition is so clearly wrong as to need no discussion. We think this disposes of all questions submitted to us, except that the verdict was against the evidence. The plaintiff in error maintains that, on all the evidence, the United States failed to make out a case against him, either on count 84 or count 95. For reasons already stated, we need consider only count 84. The plaintiff in error divides this proposition into one of law and one of fact. He maintains that, as the count charges him with "willfully misapplying," he could not be convicted under it, because the assets which he is accused of misapplying were in his actual possession. He maintains, therefore, that the proper offense chargeable against him was that of embezzlement, and that embezzlement and misapplication are not the same things, within the purview of the statute. It is true that it is quite probable that he might properly have been charged with embezzlement. Nevertheless, while "embezzlement" and "misapplication" are not convertible terms, "misapplication" is the broader, and covers "embezzlement." The statute, in this particular, is one of those frequently found in criminal legislation, as well as in other legislation and in private instruments, where there is first used a word of narrow application, and afterwards a broader one, and so continued until there is a certainty that the entire purpose sought to be accomplished is ac-

complished. It is not necessary, under such circumstances, to apply the rule that every word in a statute must have its effect, to such an extent as to hold that the generic term is to be so peculiarly construed, contrary to its settled meaning, as to exclude from its scope the narrower word which precedes it.

As we have already said, the record shows that the United States rested this count on an item, appearing in Jewett's statement of the alleged payments made by him as agent in liquidation, as follows: "1894, Nov. 1. Paid A. E. Butler 50 shares stock, Cert. No. 478, $4,000.00." This was intended to represent a dividend of 80 per cent. in liquidation. As we have also said, it is difficult to understand, so far as anything appears in the record, by virtue of what the United States assumed that the grand jury had in view this particular item in finding count 84. This we note only that it may not be understood that we are bound by what appears, or does not appear, in the record with reference to this precise matter. The number of counts relied on by the United States before discontinuance, and the transactions of the accused which were laid before the jury, were numerous. For aught that appears, the accused was fully prepared to meet at the trial all the several offenses with which he was charged, and, so far as the record shows, he was indifferent which alleged offense should be assigned to any particular count. No exceptions were taken with reference to this topic, and we are led to presume that no practical injustice was done on this account in the trial of the cause. Certainly we have no jurisdiction with reference to any such difficulty as we have suggested.

The pith of the instruction given to the jury by the court below in reference to this item was as follows:

"It is contended by the United States that Butler had no shares; that those shares were the shares of William S. Jewett; and they show to you a certificate of stock, and they show to you a power of attorney in blank for the transfer of the stock. Well, if that stock were in fact Mr. Jewett's, or if the stock were in fact Mr. Butler's, the question seems to me, gentlemen, to be the same. It is the same old question, whether there was an honest belief at that time that there were assets of that bank sufficient to pay everybody pro rata, or whether that was a mere cover to appropriate the property of the bank."

No question is made by the plaintiff in error as to the propriety of this instruction. Therefore the substantial issue framed for the jury was whether or not this money was in fact paid to Mr. Butler, or was appropriated by the plaintiff in error under cover of this entry. There was some very persuasive evidence to go to the jury on this issue, among which was that, while for the larger portion of the transactions of the plaintiff in error as agent in liquidation checks were produced, none was produced for this transaction; and his explanation, as witness in his own behalf, as to the manner in which he paid over this money, was indefinite. Another fact which the jury was entitled to weigh was that Butler was indebted on notes to the association of more than $4,000, which were never paid, and which the plaintiff in error, acting as agent in liquidation, would ordinarily have realized and collected, at least in part, by

offset, if a dividend had become payable to Butler as a stockholder for the large amount claimed to have been paid him. Under the circumstances, the question whether or not the evidence sustained the verdict was, on this record, for the court below, so that its determination cannot be revised by us.

The judgment of the circuit court is affirmed.