## CHEMICAL NATIONAL BANK *v.* HARTFORD DEPOSIT COMPANY.

### ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 735.   Submitted January 7, 1896. — Decided February 3, 1896.

The legal existence of a corporation is not cut short by its insolvency and the consequent appointment of a receiver; and there is nothing in the statutes relating to national banks which takes them out of the operation of this general rule.

After passing into the hands of a receiver, appointed by the Comptroller of the Currency, under the provisions of the Revised Statutes, a national bank remains liable, during the remainder of the term, for accrued and accruing rent under a lease of the premises occupied by it, although the receiver may have abandoned and surrendered them; but if the lessor, in the exercise of a power conferred by the lease, reënters and relets the premises, the liability of the bank after the reletting is limited to the rent then accrued and unpaid, and the diminution, if any, in the rent for the remainder of the term, after the reletting.

THIS was an action of assumpsit brought by the Hartford Deposit Company against the Chemical National Bank of Chicago and the receiver of the bank in the Superior Court of Cook County to recover damages for a failure to pay rent

1

alleged to be due, under a written lease, from August 1, 1893, to April 30, 1894. The cause was submitted to the court for trial on a stipulation as to the facts, of which the lease formed a part; the issues were found in favor of defendants and judgment was rendered accordingly. Plaintiff took the case to the Appellate Court for the first district of Illinois, which affirmed the judgment as to the receiver, but reversed it as to the Chemical National Bank, and entered judgment for the sum of $9000. 58 Ill. App. 256. An appeal was prosecuted to the Supreme Court of Illinois and the judgment of the Appellate Court affirmed. 156 Illinois, 522. This writ of error was thereupon brought.

The facts were thus stated by the Supreme Court:

"The Chemical National Bank of Chicago entered into a lease, dated November 18, 1892, with the Hartford Deposit Company, of a banking office of a certain building owned by the said Hartford Deposit Company. In accordance with its terms the bank paid $2500 on the delivery of said lease. The term was for a period of five years, from May 1, 1893, at an annual rental of $12,000, payable in equal monthly instalments of $1000 in advance, exclusive of and in addition to said first payment of $2500. The bank entered into and took possession of said premises on May 1, 1893, the first day of said term, and the first instalment of rent fell due and was payable on that day. This instalment was not paid when due, nor had it, or any part of it, been paid when, on May 9, 1893, the bank became insolvent and a national-bank examiner took possession of its assets and of said premises. On July 21 a receiver was duly appointed, and on July 27 he notified the Hartford Deposit Company of his election to terminate said lease after July 31, 1893, so far as he, as receiver, was concerned. On the same day, namely, July 27, said receiver paid to the Hartford Deposit Company the sum of $2709.68, which was, as agreed, the ratable amount of rent due for the period to July 31, inclusive. No other or further rent was paid under said lease by any other person or at any other time. The premises remained vacant until May 1, 1894, when they were relet at a reduced rental."

*Mr. Hiram T. Gilbert* for plaintiff in error.

I. The appointment of a receiver of a national banking association by the Comptroller of the Currency on account of its insolvency amounts, for all practical purposes, to the dissolution of such association. *Fidelity Safe Deposit & Trust Co.* v. *Armstrong*, 35 Fed. Rep. 567; *Bethel Bank* v. *Pahquioque Bank*, 14 Wall. 383; *White* v. *Knox*, 111 U. S. 784; Rev. St. §§ 5141, 5151, 5191, 5195, 5201, 5205, 5234, 5235, 5236, 5239; act of June 30, 1876, c. 156, 19 Stat. 63.

II. A claim to be entitled to be proven up and paid by dividends out of the assets of a national banking association in the hands of a receiver must be one which, at the date of the suspension of the association, was a then existing demand, and the claim for rent under this lease is not such a demand. *Riggin* v. *Magwire*, 15 Wall. 549; *French* v. *Morse*, 2 Gray, 111, 115; *Savory* v. *Stocking*, 4 Cush. 607; *Dean* v. *Caldwell*, 127 Mass. 242; *White* v. *Knox*, 111 U. S. 784; *Fidelity Safe Deposit & Trust Co.* v. *Armstrong*, 35 Fed. Rep. 567; *Chemical Nat. Bank* v. *Armstrong*, 59 Fed. Rep. 372.

III. After the appointment by the Comptroller of the Currency of a receiver of a national banking association judgment cannot be rendered against such association, or its receiver, for any claim which, at the date of the bank's suspension, was not an existing demand. *Bethel Bank* v. *Pahquioque Bank*, 14 Wall. 383; *White* v. *Knox*, 111 U. S. 784; Rev. Stat. §§ 5235, 5236.

*Mr. Charles H. Baldwin* for defendant in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

It is not claimed that the express covenant to pay rent was released by the insolvency of the lessee merely; nor that the election of the receiver not to accept the lease had any effect on the contract between the lessor and the lessee; nor that the lessor had done anything itself to terminate its rights under the lease. But it is argued that no judgment could be

rendered against the bank because the appointment of a receiver amounted to its dissolution, and because the rent in question was not a demand existing at the date of the bank's suspension, and, therefore, not a claim entitled to be proven up and paid out of the assets of the bank or carried into judgment. The state courts ruled both branches of this contention adversely to plaintiff in error.

Granting that, in the absence of statutory provision to the contrary, suits cannot be maintained and judgments rendered against corporations whose chartered existence has terminated, it is not pretended in this case that that event had taken place by lapse cf time, by judicial proceedings, or otherwise, unless, as is insisted, the appointment of a receiver in itself put an end to the bank as a corporate entity.

The general rule is that the legal existence of a corporation cannot be cut short in this way, and we can find nothing in the statutes in relation to insolvent national banks which gives that effect to such an appointment or justifies any distinction in that regard as between them and other insolvent corporations.

By section 5136 of the Revised Statutes it is provided that every national bank, duly incorporated, shall have succession for the period of twenty years from its organization, "unless it is sooner dissolved according to the provisions of its articles of association, or by the act of its shareholders owning two-thirds of its stock, or unless its franchise becomes forfeited by some violation of law."

A receiver may be appointed upon the occurrence of the particular defaults enumerated in sections 5141, 5151, 5191 5195, 5201, and 5205, not in question here.

Section 5151 provides : "The shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares."

Sections 5220 and 5221 provide for the voluntary dissolution of these associations, and sections 5226 and 5227 for the pro-

test of their circulating notes on failure to redeem and the appointment of a special agent to ascertain the fact.

Sections 5228, 5234, 5236, and 5239 are as follows:

" Sec. 5228. After a default on the part of an association to pay any of its circulating notes has been ascertained by the Comptroller, and notice thereof has been given by him to the association, it shall not be lawful for the association suffering the same, to pay out any of its notes, discount any notes or bills, or otherwise prosecute. the business of banking, except to receive and safely keep money belonging to it, and to deliver special deposits."

" Sec. 5234. On becoming satisfied, as specified in sections fifty-two hundred and twenty-six and fifty-two hundred and twenty-seven, that any association has refused to pay its circulating notes as therein mentioned, and is in default, the Comptroller of the Currency may forthwith appoint a receiver, and require of him such bond and security as he deems proper. Such receiver, under the direction of the Comptroller, shall take possession of the books, records, and assets of every description of such association, collect all debts, dues, and claims belonging to it, and, upon the order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts, and, on a like order, may sell all the real and personal property of such association, on such terms as the court shall direct; and may, if necessary to pay the debts of such association, enforce the individual liability of the stockholders. Such receiver shall pay over all money so made to the Treasurer of the United States, subject to the order of the Comptroller, and also make report to the Comptroller of all his acts and proceedings."

" Sec. 5236. From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the Comptroller shall make a ratable dividend of. the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends

on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held."

"SEC. 5239. If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this title, all the rights, privileges, and franchises of the association shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper Circuit, District, or Territorial Court of the United States, in a suit brought for that purpose by the Comptroller of the Currency, in his own name, before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

On June 30, 1876, (19 Stat. 63, c. 156,) Congress passed an act, the first section of which provides: "That whenever any national banking association shall be dissolved, and its rights, privileges, and franchises declared forfeited, as prescribed in section fifty-two hundred and thirty-nine of the Revised Statutes of the United States, or whenever any creditor of any national banking association shall have obtained a judgment against it in any court of record, and made application, accompanied by a certificate from the clerk of the court stating that such judgment has been rendered and has remained unpaid for the space of thirty days, or whenever the Comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, in either case, appoint a receiver, who shall proceed to close up such association and enforce the personal liability of the shareholders, as provided in section fifty-two hundred and thirty-four of said statutes."

By the third section, whenever any association is placed in the hands of a receiver and the creditors and expenses have been paid and the redemption of the circulating notes of such

association provided for, the shareholders may elect an agent to whom on filing bond the remaining assets of the association shall be transferred, and "such agent shall hold, control, and dispose of the assets and property of any association which he may receive as hereinbefore provided for the benefit of the shareholders of such association as they, or a majority of them in value or number of shares, may direct, distributing such assets and property among such shareholders in proportion to the shares held by each; and he may, in his own name or in the name of such association, sue and be sued, and do all other lawful acts and things necessary to finally settle and distribute the assets and property in his hands."

It thus appears that by the terms of the statutes the corporation continues, notwithstanding the appointment of a receiver, if its corporate life has not been extinguished by lapse of time, by any provision of its articles, by any action of its stockholders, or by any judgment of forfeiture. The receiver is indeed appointed to close up the association, that is to say, to wind up its business, get in its assets, and pay its debts, and, if need be, to enforce the personal liability of its shareholders for all its "contracts, debts, and engagements;" but the corporation lingers while this is being done, and on occasion when the receiver has discharged his duty with the satisfactory results enumerated and assets remain, an agent may be chosen, who may sue and be sued in the name of the association in the conduct of the final liquidation. Of course when insolvency is declared the corporation is incapacitated from doing any new business. It has ceased to be a going concern, but it still survives for the purpose of the discharge of its liabilities and the final distribution of its remaining assets when that has been accomplished. No refinement of construction leads to any other result and numerous decisions preclude further discussion.

In *Pahquioque Bank* v. *Bethel Bank*, 36 Connecticut, 325, a national bank having failed and a receiver been appointed, the Supreme Court of Errors of Connecticut, in a well considered opinion, held that the winding up of the corporation as provided did not put an end to its existence so as to affect

the rights of creditors to enforce their claims or determine their validity by suit or otherwise; that there was nothing in the national banking act which justified the claim that the franchise was transferred to the receiver in the authority conferred on him to take possession of the assets; and that the court was unable to discover " by what mode of operation known in the law the proceedings in question can produce that absolute and technical dissolution of a corporation which is produced by a judgment for forfeiture or by a legislative repeal, and bars a suit by a creditor." Judgment was given against the insolvent bank and that judgment affirmed by this court in *Bank of Bethel* v. *Pahquioque Bank*, 14 Wall. 383, where it was said : " None of these proceedings, however, support the theory that the association ceased to exist when the receiver was appointed, nor at any time before the assets of the association are fully administered, and the balance, if any, is paid to the owners of the stock or their legal representatives."

In *National Bank* v. *Insurance Company*, 104 U. S. 54, 73, it was held that a national bank in voluntary liquidation is not thereby dissolved as a corporation, but may sue and be sued by name for the purpose of winding up its business; and Mr. Justice Matthews, delivering the opinion of the court, said: " It is to be observed that the sections under which the proceedings took place which, it is claimed, put an end to the corporate existence of the bank, do not refer, in terms, to a dissolution of the corporation, and there is nothing in the language which suggests it, in the technical sense in which it is used here as a defence. The association goes into liquidation and is closed. It is required to give notice that it is closing up its affairs, and in order to do so completely and effectually, to notify its creditors to present their claims for payment. And the redemption of its bonds given to secure the payment of its circulating notes, by the required deposit of money in the treasury, is limited in its effect to a discharge of the association and its shareholders from all liability upon its circulating notes. The very purpose of the liquidation provided for is to pay the debts of the corporation, that the

remainder of the assets, being reduced to money, may be distributed among the stockholders. That distribution cannot take place, with any show of justice, and according to the intent of the law, until all liabilities to creditors have been honestly met and paid. If there are claims made which the directors of the association are not willing to acknowledge as just debts, there is nothing in the statute which is inconsistent with the right of the claimant to obtain a judicial determination of the controversy by process against the association, nor with that of the association to collect by suit debts due to it. It is clearly, we think, the intention of the law that it should continue to exist, as a person in law, capable of suing and being sued, until its affairs and business are completely settled. The proceeding prescribed by the law seems to resemble, not the technical dissolution of a corporation, without any saving as to the common law consequences, but rather that of the dissolution of a copartnership, which, nevertheless, continues to subsist for the purpose of liquidation and winding up its business."

And in *Rosenblatt* v. *Johnston*, 104 U. S. 462, 463, Mr. Chief Justice Waite, speaking for the court, referring to the assets and property of an insolvent national bank, remarked : " Such property and assets, in legal contemplation, still belong to the bank, though in the hands of a receiver, to be administered under the law. The bank did not cease to exist on the appointment of the receiver. Its corporate capacity continues until its affairs are finally wound up and its assets distributed."

It is further urged that the claim was not an existing demand at the time of the suspension of the bank and could not be proven up for participation in the distribution of the assets. What effect, if any, this might have on the mere recovery of judgment, and the questions often arising in respect of discharges in bankruptcy or insolvency, or of proceedings against insolvent decedents' estates as to the postponement of belated claims to subsequently discovered assets, the state courts did not find it necessary to consider, as they were of opinion that the liability was an existing demand.

. The Appellate Court said : " The lease in question was a lawful contract and engagement for the bank to make. The first monthly instalment of rent was due under it nine days before the bank suspended. By its terms the default that was made by the bank in the non-payment of rent on May 1, gave the right to the appellant to reënter and terminate the lease. The damages were then matured and could have been at once sued for, or appellant could defer its suit, as it did, until by a reletting of the premises the extent of damages had been made certain. That they were unliquidated did not render them contingent. The contingency, default in payment of rent, had happened. After that the damages were a mere matter of calculation." And a similar view was thus expressed by the Supreme Court : " The money was not paid, and there was then a breach of the contract for which an action might have been maintained, and this occurred nine days before insolvency. There is, therefore, no foundation for the position of counsel that the claim of appellee was not an existing demand at the time the bank suspended. The amount of damages may not have been as large on the first day of May, 1893, as at a later period, but on that date there was a breach of the contract and a right of action for such breach."

Clearly the conclusion thus reached involved no denial of a title, right, privilege, or immunity specially set up or claimed under the laws of the United States, and, as already seen, the only Federal question arising was rightly decided.

*Judgment affirmed.*